# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
Filed: September 30, 2020

| | | |
|---|---|---|
| * * * * * * * * * * * * * | | |
| GARLAND RUCKER, | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 19-204V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Fact Ruling; Onset; Influenza ("Flu") |
| AND HUMAN SERVICES, | * | Vaccine; Transverse Myelitis ("TM"). |
| | * | |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * | | |

Lawrence Gene Michel, Kennedy, Berkley, et al., Salina, KS, for petitioner.
Althea W. Davis, U.S. Department of Justice, Washington, DC, for respondent.

## FACT RULING[1]

On February 5, 2019, Garland Rucker ("petitioner" or "Mr. Rucker") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, et seq.,[2] ("Vaccine Act" or "the Program"). Petitioner alleges that he suffered transverse myelitis ("TM") after receiving an October 18, 2016 influenza ("flu") vaccination. Petition at Preamble (ECF No. 1). Respondent, however, asserts that onset of petitioner's alleged injury began prior to administration of his flu vaccine. Respondent's Report ("Resp. Rept.") at 23 (ECF No. 44). Subsequently, the parties discussed the issue of onset, and petitioner requested a fact hearing to

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012). All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

resolve the question. Order dated May 20, 2020, at 1-2 (ECF No. 45). A fact hearing was held on August 6, 2020. Transcript ("Tr.") 1.

After reviewing all of the evidence, and considering the testimony given by the petitioner and his wife, Georgia Rucker, at the hearing, and for the reasons discussed below, the undersigned finds that onset of petitioner's numbness from his abdomen to his legs began in September 2016, before the flu vaccine administered to him on October 18, 2016.

## I.     PROCEDURAL HISTORY

Along with his petition, petitioner submitted medical records and his affidavit on February 5, 2019. Petitioner's Exhibits ("Pet. Exs.") 1-5. Over the course of the next 14 months, petitioner filed additional medical records. Pet. Exs. 6-21. On May 8, 2020, respondent filed his Rule 4(c) Report, stating that the case was not appropriate for compensation, based in part on his belief that onset of petitioner's numbness, the initial manifestation of his neurological condition, began before petitioner received the October 18, 2016 flu vaccination at issue. Resp. Rept. at 23. Specifically, respondent stated that petitioner complained of leg numbness and tingling on October 15, 2016 and numbness in the epigastric area on October 17, 2016. Id. at 22. Respondent noted that on October 28, 2016, petitioner gave a history of numbness in his thighs that began a month before, after petitioner lifted a large object. Id. Respondent cited additional medical record entries that referenced similar histories reported by petitioner. Id.

During a status conference held on May 20, 2020, the parties discussed how they would like to proceed in this case. Order dated May 20, 2020, at 1-2. The petitioner requested the opportunity to present testimony about onset in a fact hearing. Id. at 2. The fact hearing was held by video conference on August 6, 2020. Tr. 1. The petitioner and his wife, Georgia Rucker, testified. Tr. 3.

The factual issue regarding onset is now ripe for adjudication.

## II.    FACTUAL HISTORY

### A.    Summary of Medical Records Related to Onset

Petitioner has a complicated medical history and has filed many medical records documenting his medical care and treatment, including treatment of conditions which are not related to his vaccine injury claim. For purposes of clarity, the undersigned provides a summary of entries in the petitioner's medical records which relate only to onset of his symptoms of abdominal numbness and numbness of his legs and/or tingling or paresthesias.[3] Thus, references to low back pain, sciatica, knee pain, and symptoms of other conditions which petitioner received care for during the time frame of 2015 to 2019 are not discussed here.

---

[3] The undersigned has reviewed all of the petitioner's medical records, but only summarizes those pertinent to onset. For a more thorough summary of the records, see Resp. Rept. at 2-15.

On October 15, 2016, petitioner, then age seventy-one, presented to the Herington Municipal Hospital ("Herington") Emergency Room ("ER") complaining of right leg numbness and tingling for the past two days. Pet. Ex. 19-C at 1106. Petitioner was diagnosed with right leg edema and discharged in stable condition. Id.

On October 17, 2016, petitioner presented to the Herington ER for complaints of hematuria and history of right leg deep vein thrombosis. Pet. Ex. 19-C at 1113. Documenting the history of present illness, Marcy L. Evans, PA-C, wrote, "[t]oday [complains of] numbness to epigastric area" and abdominal discomfort. Id. Diagnostic workup, including CT scans, showed a large left lower lobe pulmonary embolus and kidney stone. Id. at 17, 19.

That same day, October 17, 2016, petitioner was transferred to Salina Regional Health Center ("SRHC") for treatment. Pet. Ex. 9 at 302. In his admitting history and physical, Dr. Seth Vernon charted that petitioner had presented to Herington "earlier in the day of admission with complaints of abdominal numbness." Id.

While in SRHC receiving treatment for his pulmonary embolus, petitioner received the flu vaccination at issue here on October 18, 2016. Pet. Ex. 13-C at 653, 701; Pet. Ex. 15 at 400. Petitioner was discharged from SRHC on October 21, 2016. Pet. Ex. 4 at 152-53.

Petitioner saw Dr. Eric Wolfe on October 28, 2016 at the Herington Area Health Clinic. Pet. Ex. 19-C at 1129. Petitioner's chief complaint was "[n]umbness in stomach/thighs/sick at stomach x 1 month- shaking, weak." Id. Petitioner described "[p]ressure or numbness to abdomen, lowest rib cage and downward. Legs more pronounced in AM. Started 1 month ago after lifting large fan out of truck. . . . Most mornings [his] legs [feel] weak, feels shaky, felt like walking like crab." Id. Physical examination did not reveal any focal neurological deficits. Id. at 1130. Dr. Wolfe ordered diagnosed tests, referred petitioner to Dr. Paul Johnson (GI physician), and instructed petitioner to return if his condition worsened. Id.

Dr. Wolfe next saw petitioner on January 25, 2017, again complaining of "[n]umbness in the stomach, as well as legs and toes." Pet. Ex. 9 at 294. Dr. Wolfe wrote that petitioner had similar symptoms back on October 28, 2016. Id. Petitioner had seen Dr. Johnson and had undergone diagnostic tests which showed "erosions of the esophagus" and "benign polyps." Id. Along with pressure in his abdomen, petitioner also reported "pain and numbness in his bilateral inner legs down into [his] feet and to his toes." Id. Petitioner stated that "the symptoms in his legs[] initially started around the end of September, after he was lifting a large fan out of his truck, resting it on his thighs." Id. Dr. Wolfe ordered laboratory studies and additional diagnostic tests and referred petitioner to Dr. Davis, a neurologist. Id. at 295.

In April 2017, petitioner had treatment for right foot pain. Pet. Ex. 19-D at 1153; Pet. Ex. 5 at 249. At a follow up appointment for his right foot pain with Dr. John Mosier on April 27, 2017, petitioner repeated his history of "numbness in his legs and lower abdomen" that "started approximately September or October last year." Pet. Ex. 5 at 202. Dr. Mosier referred petitioner to Dr. William D. Kossow for nerve conduction studies. Id. Dr. Mosier also noted that petitioner had an appointment to see a neurosurgeon, Dr. Scott M. Boswell. Id.

Petitioner saw Dr. Kossow on May 1, 2017.  Pet. Ex. 2 at 4.  Dr. Kossow's history states that petitioner presented with "constant tingling numbness in the bilateral feet and legs, especially in the inner thighs and groin.  Also feels numb on lower abdomen."  Id.  "[Lower extremity] and abdominal numbness started in Aug[ust] 2015 after lifting."  Id.  Dr. Kossow noted that petitioner had a "[g]radual onset" and that duration of the condition was "1.5 years."  Id.

Next, petitioner saw Rebecca Loomis, PA-C, in Dr. Boswell's office, on May 16, 2017.  Pet. Ex. 11 at 323.  Ms. Loomis documented that petitioner had a "6 month history of right-sided low back pain" after lifting "2 heavy warehouse fans."  Id. at 324.  Petitioner also reported a "constant numbness 'like a band' around his mid abdomen, groin[,] and medial thighs to the knees bilaterally and into the balls of his feet.  He feels his legs are weak."  Id.  While Ms. Loomis documented the onset of petitioner's low back pain, she did not specifically document the onset of his abdominal numbness.

An MRI of petitioner's thoracic spine was performed on May 22, 2017, which showed a "subtle abnormal cord signal in the thoracic cord at about the T2/T3 level."  Pet. Ex. 19-D at 1172.  Petitioner saw Ms. Loomis the next day, May 23, 2017.  Pet. Ex. 16-A at 835.  Ms. Loomis reviewed the MRIs with Dr. Boswell, and documented that they showed "mild degenerative changes" but no surgery was recommended.  Id. at 838.  Ms. Loomis' note regarding petitioner's MRI does not specifically reference the abnormal thoracic cord signal at T2/T3.  See id.

Petitioner returned to see Ms. Loomis on July 11, 2017.  Pet. Ex. 16-A at 839.  At this visit, Ms. Loomis' note focuses on petitioner's low back pain and his treatment for that problem with a chiropractor.  Id. at 839-41.

On March 8, 2018, petitioner saw neurologist, Dr. Norman I. Bamber, after referral from Dr. Mosier.  Pet. Ex. 3 at 19.  Petitioner reported "numbness [from] the middle of his chest down to his toes," which had been "[g]oing on for about two years."  Id.  Petitioner explained that he "first noted these symptoms after unloading some large objects which he bought from a store."  Id.  He also stated that he had complained of numbness previously.  Id.  Petitioner complained that he was having "difficulty walking," and "fe[lt] that his legs no longer 'hold him up.'"  Id.  He had a "very numb sensation anteriorly at the bottom of his sternum with a 'less numb' sensation in the abdomen and pelvis" as well as "numbness in his legs from the feet up until the anterior medial thigh . . . [with] burning/tingling in his feet bilaterally."  Id.  Dr. Bamber reviewed the May 22, 2017 MRI and commented that it showed an increased signal of the spinal cord at T2-T3.  Id. at 20.  Dr. Bamber ordered a repeat MRI of the thoracic spine, which was done on March 8, 2018.  Id. at 21, 23-25.  The findings were similar to the prior MRI; as there "continues to be a signal abnormality in the spinal cord centered at T3-T4" with "subtle enhancement."  Id. at 25.

Dr. Bamber referred petitioner to neurologist Dr. Kimberly Cochran, and she saw petitioner on March 15, 2018.  Pet. Ex. 3 at 38-39.  Dr. Cochran documented petitioner's history as follows: "The patient's symptoms started [two] years ago.  He has numbness in the middle of his chest down to his toes.  He felt it was of acute onset after lifting some large awkward objects

4

which weren't necessarily heavy.  He feels his symptoms have been progressive." Id. at 39.  Dr. Cochran diagnosed petitioner with idiopathic TM, and ordered additional diagnostic studies to rule out multiple sclerosis.  Id. at 41.

Petitioner saw Dr. Cochran again on May 1, 2018 for follow up after the additional testing.  Pet. Ex. 3 at 34-35.  At this visit, Dr. Cochran's history states that, "[t]he patient's symptoms started around March 2016." Id. at 35.  After reviewing his history and diagnostic testing, Dr. Cochran concluded that petitioner most likely had "idiopathic [TM]" and that his condition was stable.  Id. at 37.

Moving forward, petitioner saw neurologist Dr. Yasir Jassam at the University of Kansas Department of Neurology ("Kansas Neurology") on August 15, 2018.  Pet. Ex. 16A at 786.  Dr. Jassam noted that petitioner's "symptoms started in late 2016." Id. at 789.  Petitioner returned to Kansas Neurology for a follow up appointment on November 7, 2018, and saw Dr. Amanda Thuringer.  Id. at 823-27.  Dr. Thuringer's history stated that petitioner "developed progressive numbness, paresthesias[,] and weakness to [his] trunk over the course of several months beginning in November 2016." Id. at 823.  Dr. Jassam and Dr. Thuringer next saw petitioner on April 25, 2019.  Pet. Ex. 7 at 264.  Dr. Thuringer repeated the prior history, specifically that petitioner's symptoms began in November 2016.  Id.  At that visit, Dr. Thuringer noted that petitioner's TM was

> somewhat chronic progressive in onset with persistent enhancement (Nov 2016 to April 2018).  There is a temporal association with [flu] vaccine.  So far, extensive workup has been unrevealing for cause.  Neurosarcoidosis remains possible, but no supportive evidence so far.  MRI 11/2018 showed resolution of enhancement and improvement of T2 hyperintensity.  There is no evidence of recurrence on exam.

Id. at 267.

The last reference to onset in petitioner's medical records appears on September 7, 2019, by Dr. Gregory Erb, who petitioner saw for knee pain.  Pet. Ex. 20 at 1214.  Dr. Erb wrote, "[p]er Dr. Yasir Jassam's clinical note patient started experiencing symptoms [of TM] around March 2016, starting with numbness in the middle of chest down to his toes." Id.

### B.     Affidavits and Hearing Testimony

#### 1.     Petitioner's Affidavit and Hearing Testimony

In his affidavit, petitioner states that he developed "pressure around [his] solar plexus and numbness and tingling in [his] legs, abdominal area, and chest" by "late October or early November [] 2016," after he received the flu vaccine.  Pet. Ex. 1 at ¶ 3.

At the hearing, petitioner testified that "[he] was in good health" in October 2016.  Tr. 11.  He explained that in November 2016, he began to experience weakness and numbness below the knee in both legs.  Tr. 12.  He recalls these symptoms began "within two or three weeks" after

5

his trip to Silver Dollar City in Missouri on Veteran's day in November 2016.  Tr. 13.  He testified that he first saw a doctor about these symptoms on January 25, 2017 when he saw Dr. Wolfe.  Tr. 14-15.  Petitioner did not recall what Dr. Wolfe recommended for further treatment or testing, nor did he recall whether an MRI was performed.  Tr. 15.  Petitioner also did not recall what medical treatment he received after a February 2017 MRI.  Tr. 16.

Next, petitioner was questioned about a visit to Kansas Neurology in April 2019.  Tr. 17.  He agreed with the physician's summary that stated he "developed progressive numbness, paresthesias[,] and weakness to the trunk over the course of several months, beginning in November of 2016."  Id. (quoting Pet. Ex. 7 at 264).  Petitioner was then questioned about a May 2017 visit with a chiropractor, where petitioner's chiropractor wrote "[p]atient stated that the pain came on back last November [2016] . . . from lifting something at home."  Tr. 18-19 (quoting Pet. Ex. 12 at 332).  Petitioner testified that he "[did not] remember when the onset of that pain was" but attributed the pain to sciatica.  Tr. 19.

When asked about his visit to Salina Regional Neurosurgery in May 2017, he could not recall whether he reported any numbness to his neurologist.  Tr. 20.

On cross-examination, petitioner agreed that prior to the vaccination at issue here, he had GERD, hypertension, and a history of kidney stones and deep vein thrombosis.  Tr. 23-24.  He did not recall when he was first diagnosed with deep vein thrombosis, and explained "time gets away from [him]."  Tr. 23.  Petitioner also did not recall visits to Herington ER on October 2, 2016, where he complained of abdominal bloating and epigastric pain, and on October 15, 2016, where he complained of right leg numbness and tingling for two days.  Tr. 26.

When cross examined about his ER visit on October 17, 2016, petitioner did "[n]ot specifically" recall the visit.  Tr. 27-28.  Petitioner also did not recall visits with Dr. Wolfe on October 28, 2016 and January 25, 2017.  Tr. 30-32.  He testified that he would not disagree with Dr. Wolfe's records from these visits noting his numbness began in September 2016 after lifting a fan.  See Tr. 31-32.

Next, petitioner was cross examined about a visit on April 27, 2017, which he could not recall.  Tr. 32-33.  Although petitioner remembered seeing Dr. Kossow on May 1, 2017 for a nerve conduction study, he did not remember complaining of constant tingling and numbness in the bilateral feet and legs since August 2016.  Tr. 33.

Additionally, petitioner could not recall what he wrote in his affidavit regarding onset of his symptoms.  Tr. 33-34.  He testified that he believes his vaccine-related symptoms began "toward the end of November, first part of December of [2016]," even though his affidavit states onset of his symptoms was in late October or early November 2016.  Tr. 34-35.  These symptoms included numbness and pressure around his stomach described as a band that keeps tightening, knots in his stomach and back, numbness in feet, weakness in legs, and trouble walking and standing.  Id.  He could not recall when he first complained of the feeling of a band around his stomach to a doctor, or when he first associated his November or December 2016 symptoms with his vaccination.  Tr. 36.  He admitted that when he brought up the association

6

between his vaccination and symptoms to his doctors, they "seemed to be reluctant to admit that there was any connection with vaccines" until "[he] finally got one to admit" the connection. Id.

Petitioner testified that he is "sure [his memory of events in 2016 and 2017 was] better than it is now." Tr. 37. He explained that he has seen so many doctors and had so many tests that "it all runs together." Id.

He testified that his symptoms have not gotten worse, but they are about the same and have not gotten better. Tr. 38. "The band . . . seems tighter than it used to . . . . [He] can't walk very far. [He] can't stand very long." Tr. 38-39. He also has problems driving his farm equipment with standard transmission. Tr. 39, 43-44.

On redirect, petitioner testified that he does not recall having numbness and tingling in his legs from his deep vein thrombosis. Tr. 42. Regarding his sciatica, the pain was so "horrible" that he only focused on the pain, but numbness and weakness in his legs continued after he no longer had sciatica pain. Id. He testified that the symptoms he experienced when lifting the fan were "more of a bruise or strain," which is "nothing" like his current symptoms. Tr. 42-43.

### 2. Affidavit and Hearing Testimony of Petitioner's Wife, Georgia Rucker

During the hearing, Ms. Rucker testified that petitioner "was in really good shape" around October 2016. Tr. 47. Petitioner did not complain or indicate that he was experiencing any numbness or weakness in his legs prior to October 2016. Tr. 47-48.

In her affidavit, Ms. Rucker avers that she and her husband traveled to Branson, Missouri, on Veterans Day (November 11) 2016, and that her husband had "no problems" walking. Pet. Ex. 22 at ¶ 4. Additionally, she stated that "[h]e still did not seem to have any symptoms." Id. at ¶ 5. During the hearing, Ms. Rucker reiterated that petitioner had no problems walking during this trip. Tr. 48.

Ms. Rucker testified that "within the next week and a half" petitioner "told [her] that his legs just felt very numb, that he didn't really feel his feet." Tr. 48-49. While they were watering cattle across from their house, he described the pain as "a band around [his] abdomen, like somebody has a belt and they are tightening it down." Tr. 49. He also began to stumble. Id.

She recalls a time in December 2016 when her husband "felt like he had a belt around his lower chest." Pet. Ex. 22 at ¶ 7. Shortly after this, she stated that her husband "began to stumble and even fall because . . . his feet [] felt numb." Id. at ¶ 9.

Ms. Rucker also recalled an incident when they were having fences built on their property, and while walking the perimeter of their property, petitioner "face planted." Tr. 54.

Ms. Rucker testified that she could not recall when that event occurred, but knew "it was in the fall."[4]  Id.

With regard to the references in the medical records to moving a fan or fans, Ms. Rucker testified that she purchased the heavy fans in the fall of 2016.[5]  Tr. 54.  Petitioner was "supposed to wait for [his] sons to help him unload them, and he didn't."  Tr. 54-55.  Ms. Rucker thought that based on her husband's description of his symptoms, that "it sounded . . . more like it was a strain in the groin [] than anything."  Tr. 55.  She added that "when he saw doctors, he kept trying to link [his symptoms] to [the fans] because that's the only thing he did that he could . . . link to what was going on.  He thought maybe he hurt his back . . . , because [they] didn't know about [TM] and flu shots."  Id.

Ms. Rucker testified that petitioner's symptoms have not changed since November 2016, and "if anything, the pressure in [his] abdomen has gotten worse.  His legs are still weak.  He can't stand very long.  He can't get his breath. . . . [T]he numbness in his feet is still there, and the weakness in his legs [is] still there."  Tr. 51-52.

On cross, Ms. Rucker testified that after her trip to Branson, Missouri with Mr. Rucker, she noticed "he would stumble" and "complain[] that his legs felt weak."  Tr. 63.  When questioned about when this first occurred, Ms. Rucker stated she did not know the exact date, but "[she] just know[s] it would have been the latter part of November into December" 2016.  Tr. 64.

### C. Post-hearing Evidence

There was testimony during the August 6, 2020 hearing regarding the association in time between petitioner moving heavy fans and the onset of his symptoms.  Additionally, Ms. Rucker testified about a fall that occurred on the farm in 2016.  Order dated Aug. 6, 2020 (ECF No. 50).  After the hearing, petitioner was ordered to file documentation showing the date petitioner purchased the fans and evidence of the date of the fall described by Ms. Rucker.  Id.

On August 18, 2020, petitioner filed documents, showing that petitioner purchased the fans on September 30, 2016.[6]  Pet. Ex. A.  Petitioner also filed screenshots of conversations

---

[4] Based on a review of the screen shots dated December 4, 2017, and the testimony of Ms. Rucker, the fall referenced by Ms. Rucker occurred sometime after December 4, 2017.  See Pet. Exs. B-C.  This fall occurred more than a year after Ms. Rucker described in her testimony, and more than a year after the onset of petitioner symptoms.  Therefore, the undersigned finds this evidence is not relevant in resolving onset.

[5] Based on documentation filed after the hearing, the fans were purchased on September 30, 2016.  See Pet. Ex. A.

[6] While the date of the check is difficult to read, it appears to be September 20, 29, or 30.  In the filing, petitioner referred to September 30 as the date on the check, so that is the date that the undersigned has used.

dated December 4, 2017, in support of Ms. Rucker's testimony that petitioner fell when they were having their fences built.  Pet. Exs. B-C; see also Tr. 54.

### III.   LAW GOVERNING ANALYSIS OF FACTUAL EVIDENCE

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records.  § 11(c)(2).  The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions."  § 13(b)(1)(A).  The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony.  See Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (noting it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such a determination is evidenced by a rational determination).

Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems).  Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993); Doe/70 v. Sec'y of Health & Hum. Servs., 95 Fed. Cl. 598, 608 (2010) ("Given the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law."); Rickett v. Sec'y of Health & Hum. Servs., 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion).  This presumption is based on the linked propositions that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions.  Sanchez v. Sec'y of Health & Hum. Servs., No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), vacated on other grounds, 809 F. App'x 843 (Fed. Cir. 2020); Cucuras v. Sec'y of Health & Hum. Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight.  Lowrie v. Sec'y of Health & Hum. Servs., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony— especially where such testimony conflicts with the record evidence.  Cucuras, 993 F.2d at 1528; see also Murphy v. Sec'y of Health & Hum. Servs., 23 Cl. Ct. 726, 733 (1991) ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight." (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 396 (1947))), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. Campbell v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Lowrie, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting Murphy, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Hum. Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

## IV.  FINDING OF FACT

The issue to be resolved is the onset of petitioner's neurological condition. Petitioner has the burden of demonstrating the facts necessary for entitlement to an award by a "preponderance of the evidence." § 300aa-12(a)(1)(A). Under that standard, the existence of a fact must be shown to be "more probable than its nonexistence." In re Winship, 397 U.S. 358, 371 (1970) (Harlan, J., concurring). In light of the medical record evidence and for the reasons described below, the undersigned finds that there is preponderant evidence that the onset of petitioner's abdominal numbness occurred prior to his October 18, 2016 flu vaccination.

In the contemporaneous medical records of October 2016, the history that petitioner consistently reported to his health care providers placed the onset of his abdominal numbness to a time frame prior to the date of his vaccination. The first time petitioner sought medical treatment for his abdominal numbness was October 17, 2016, the day before vaccination. On October 17, Marcy Evans, PA-C, wrote, "[t]oday [] numbness to epigastric area." Pet. Ex. 19-C at 1113. Although it is not clear from this note when the numbness began or the length of its duration, it is clear that petitioner had abdominal numbness on October 17. When transferred from Herington to SRHC on October 17, petitioner was evaluated by a physician, Dr. Vernon, who also noted that petitioner had complained of abdominal numbness when he presented to the hospital.

Eleven days later, on October 28, 2016, petitioner was seen by Dr. Wolfe, who documented a more detailed history. Dr. Wolfe charted that petitioner had numbness of the abdomen down to his legs that "[s]tarted 1 month ago after lifting large fan out of truck." Pet. Ex. 19-C at 1129. This is the first note that provides information about how long petitioner had been experiencing abdominal numbness. It also provides more details about the numbness, specifically that it extended from the petitioner's abdomen down to his legs. Also, Dr. Wolfe's records note petitioner places the onset in context with an event—after he lifted a large fan— which occurred around September 30, 2016.

Thus, in the period of one month, three different health care providers (at three different locations) took a history from the petitioner, and all of them placed the onset of petitioner's abdominal numbness to a date prior to his receipt of the flu vaccine. The most specific record

places onset of petitioner's abdominal numbness to one month before October 28, 2016, which would be consistent with onset after petitioner lifted the heavy fans on September 30, 2016.

In 2017, there are three more entries in petitioner's medical records that place onset of his abdominal numbness as occurring prior to vaccination. On January 25, 2017, Dr. Wolfe again charted that petitioner's abdominal numbness started the prior September. On April 27, 2017, Dr. Mosier documented that the petitioner's numbness started "September or October last year." Pet. Ex. 5 at 202. On May 1, 2017, Dr. Kossow stated that onset was August 2016. Again, all of these records consistently place onset prior to vaccination.

Ms. Loomis saw petitioner in May 2017, and she references the onset of petitioner's low back pain, but her note is ambiguous as to onset of petitioner's numbness. Moving forward to March 2018, Dr. Bamber states that petitioner has had numbness for two years, which places onset in March 2016. This is far earlier than noted in all of the other records, but certainly before petitioner received the flu vaccine.

Medical records generally "warrant consideration as trustworthy evidence." Cucuras, 993 F.2d at 1528. However, greater weight is typically given to contemporaneous records. Vergara v. Sec'y of Health & Hum. Servs., No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."). In this case, the undersigned finds that the earlier-in-time records consistently place the onset of petitioner's numbness to approximately September 2016, prior to vaccination. The fact that the records were documented by different health care providers adds reliability to the finding.

Further, the most specific evidence is the proof of purchase of the heavy fans on September 30, 2016. This is the date that petitioner references most often in the contemporaneous medical records as the event that occurred just before the onset of his problems.

The weight afforded to contemporaneous records is due to the fact that they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." Cucuras, 993 F.2d at 1528. That is exactly the context in which the above-described medical records discussed the onset of petitioner's numbness from his abdomen to his legs.

The undersigned finds petitioner's sworn statement and hearing testimony is inconsistent with the contemporaneous records. During the hearing, petitioner and Ms. Rucker could not recall exactly when they bought the large fans referred to in most of petitioner's medical records. Post-hearing evidence showed the fans were bought on September 30, 2016, which is consistent with the contemporaneous medical records and supports an onset prior to vaccination.

Petitioner presented two time periods for onset. In his affidavit, he averred his onset was in late October or early November 2016; however, he testified at the hearing that his onset was in

late November or early December 2016.  As stated above, the undersigned finds petitioner's medical records place petitioner's onset prior to vaccination in September 2016.

Moreover, at the hearing, petitioner consistently could not recall visits to physicians or the reports he gave to these physicians, nor could petitioner recall what his affidavit stated regarding the onset of his symptoms.  Petitioner admitted that "time gets away from [him]" and that "[he is] terrible with dates."  Tr. 21, 23.

The undersigned finds petitioner's affidavit and testimony inconsistent with and contradicted by the contemporaneous medical records, and thus, finds it reasonable to give greater weight to the contemporaneous medical records.  See Cucuras, 993 F.2d at 1528 (noting that "the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight"); Doe/70, 95 Fed. Cl. at 608; Stevens v. Sec'y of Health & Hum. Servs., No. 90-221V, 1990 WL 608693, at *3 (Cl. Ct. Spec. Mstr. Dec. 21, 1990) (noting that "clear, cogent, and consistent testimony can overcome such missing or contradictory medical records").

## V.     CONCLUSION

For all the foregoing reasons, the undersigned finds that there is preponderant evidence that the onset of petitioner's numbness from his abdomen to his legs began soon after September 30, 2016, before he presented to a health care provider complaining of right leg numbness and tingling for two days on October 15, 2016, and before he presented to the ER with numbness to the epigastric area on October 17, 2016.  Therefore, the onset of petitioner's symptoms occurred before the administration of his flu vaccine on October 18, 2016.

The petitioner shall review this Ruling and advise the undersigned as to how he wishes to proceed within 30 days, or **no later than Friday, October 30, 2020**.

**IT IS SO ORDERED.**

s/Nora Beth Dorsey<br>Nora Beth Dorsey<br>Special Master